## MEYERS v. SAN PEDRO, LOS ANGELES & SALT LAKE RAILROAD COMPANY.

No. 2019. Decided August 23, 1909 (104 Pac. 736).

1. MASTER AND SERVANT—INJURY TO SERVANT—NEGLIGENCE—EVIDENCE. Where, in an action for the death of the conductor in charge of the first section of a train in a rear-end collision with the second section, the evidence showed that the collision occurred a little over a mile before reaching a switch at a station which consisted of only a switch track and a water tank; that the first section at the time of the accident was running at about seven miles an hour because of a defect in the locomotive; that the second section, which had overtaken the first section at a station about twenty miles from the place of the accident, was running from twenty to thirty miles an hour—a rule of the railroad that trains will approach yard limits under full control and be prepared to stop within the limits of vision, etc., was admissible as bearing on the care of the respective crews, especially that of the crew of the second section in approaching the station. (Page 316.)

2. EVIDENCE—BEST EVIDENCE. In an action for the death of the conductor in charge of the first section of a train by the second section running into it, the testimony of the conductor of the second section as to when his train was due at a station a little over a mile beyond the place of the accident was admissible as against the objection that the time-table was the best evidence, for the fact to be proved as to when the second section was due at the station was an independent fact. (Page 317.)

3. EVIDENCE—DECLARATIONS OF AGENTS—PROOF OF AGENCY. Proof of custom of a railroad to give a service letter to discharged employes, that the superintendent of a division gave a service letter to a conductor discharged after a collision between his train and another train on that division, that the report of an investigation by the trainmaster as to the cause of the collision had been transmitted to the superintendent, without proof as to whose duty it was to give such a letter, and without showing the scope of the authority of the person whose duty it was to write it, did not establish the agency of the superintendent so as to render the letter admissible as having been written within the scope of his authority. (Page 319.)

4. EVIDENCE—ADMISSIONS—ADMISSIBILITY. The admissions of a party are admissible, regardless whether the transaction as to which they are made is itself material to the issue and admissible in evidence. (Page 320.)

5. EVIDENCE — ADMISSIONS — DECLARATIONS OF AGENTS — ADMISSIBILITY. In the absence of some direct or specific authority of an agent to make an admission to bind the principal by a particular admission of the agent within an alleged apparent scope of authority, the transaction in which the agent was acting for the principal and in respect to which the admission was made, and to which it related, must itself be material and admissible.[1] (Page 320.)

6. EVIDENCE—DECLARATIONS—RES GESTAE. The admission of a declaration as a part of the *res gestae* rests on the principle that the declaration is interwoven with the transaction of which it is a part, and is the spontaneous expresson of thoughts created by and springing out of the transaction, and the declaration in such a case is admissible for or against either party, regardless of the relation of agency. (Page 321.)

7. EVIDENCE—DECLARATIONS—RES GESTAE. A statement by a division railroad superintendent to a discharged conductor, made nine days after the discharge by the trainmaster who discharged the conductor on the day his train collided with another train, as to the cause of the collision, and contained in a service letter 'given by him to the conductor, is merely a part of the *res gestae* of the giving by the superintendent to the conductor of a service letter pursuant to the custom of the railroad, and is inadmissible to bind the railroad in an action for death caused by the collision, in the absence of evidence of the authority of the superintendent to make the statement. (Page 322.)

1 Moyle v. Congregational Soc'y, 16 Utah. 69, 50 Pac. 806; Idaho Co. v. Insurance Co., 8 Utah 41, 29 Pac. 826, 17 L. R. A. 586.

8. APPEAL AND ERROR—HARMLESS ERROR—EVIDENCE—ADMISSIBILITY. Where, in an action for the death of a railroad conductor in charge of the first section of a train caused by the second section running into it, the evidence was conflicting on material issues, the error in admitting a statement by a division superintendent to the conductor in charge of the second division to the effect that the conductor had been discharged for running down a train which was on time, and that he was dismissed from the service because of his utter disregard of the time-table rules and instructions, was prejudicial. (Page 323.)

9. MASTER AND SERVANT—"FELLOW-SERVANTS"—WHO ARE. Where two sections of a train are operated as two distinct and independent trains, the members of the crew of one section are not fellow-servants of the members of the crew of the other section within the statute defining fellow-servants as persons engaged in the service of a common employer, working together at the same place and time, and to a common purpose.2 (Page 325.)

APPEAL from District Court, Third District; *Hon. T. D. Lewis,* Judge.

Action by Lena Meyers against the San Pedro, Los Angeles & Salt Lake Railroad Company.

Judgment for plaintiff.

Defendant appeals.

REVERSED AND REMANDED FOR NEW TRIAL.

*Pennel Cherrington* for appellant.

*Booth, Lee & Badger* and *Powers & Marioneaux* for respondent.

### APPELLANT'S POINTS.

"If error is shown it will be presumed to have been prejudicial unless the record affirmatively shows that no

---

2 Jenkins v. Mining Co., 24 Utah 513, 68 Pac. 845; Dryburg v. Mining Co., 18 Utah 410, 55 Pac. 367; Neesley v. Southern Pacific, 35 Utah 259, 99 Pac. 1067.

injury did or could result." (*Holt v. Spokane Railroad*, 35. Pac. 39.) The so-called "service letter" was incompetent and hearsay. It constituted no part of the *res gestae*, was only a mere recital of past occurrences by one who did not profess to have personal knowledge of them, and who was not shown to be authorized to make admissions of liability on the part of the defendant. (Jones on Evidence, sec. 270; Elliott on Evidence, sec. 255; Encyc. of Evidence, vol. 1, page 556; Rice on Evidence, vol. 1, sec. 230; Wharton's Law of Evidence [3d Ed.], secs. 1173 and 1174; 16 Cyc. 1003.) We admit that anything that Van Housen did or said in the service letter that necessarily qualified the act of issuing the service letter was binding on the company, but the difficulty is that he did not confine himself to those things, but entered upon recitals and conclusions that were no part of the service letter, did not qualify it, but only qualified the prior transaction concerning which he had no authority whatever to bind the company by his admissions based upon conclusions arrived at from hearsay. (See *V. & T. Railroad Company v. Sayers*, 26 Grattan 328; *Stiles v. Western Railroad*, 8 Metcalf, 44; *Home Protection Company v. Whidden*, 103 Alabama 203; *Trustees v. Mitchell*, 73 Ill. App. 543; *Farmers' Mutual Insurance Co. v. Bowen*, 40 Mich. 147; *Chicago City Railway v. McMeen*, 70 Ill. App. 220; *Teal v. Meravey*, 12 Ill. App. 32; *Boston & Maine Railroad v. Ordway*, 140 Mass. 510; *Telephone Co. v. Simms' Administrator*, 99 Ky. 404; *Tuggle v. St. Louis, etc., Ry.*, 62 Mo. 425; *Lumber Co. v. Kreeger*, 52 Mo. App. 418; *Bevis v. B. & O. Railway Company*, 26 Mo. App. 19; *McDermott v. Railroad Co.*, 73 Mo. 516; *B. & O. Railroad v. School District*, 96 Pa. St. 65; *Williams v. Tel. Co.*, 116 N. C. 558; *Leistritz v. American Zylonite Co.*, 154 Mass. 382.)

RESPONDENT'S POINTS.

If the admission of the agent is offered in evidence to establish the existence or non-existence of some fact (other

than that of the existence or extent of the agency), it is necessary, in order that the admission or declaration of the agent may be binding on his principal, that the following elements should concur: (1) the fact of the agency must be established; (2) the admission or declaration must be in regard to some matter within the scope of the agent's authority; (3) the admission or declaration must (a) constitute a part of the *res gestae* of a transaction in which the agent was acting for his principal, and (b) serve to characterize that transaction. (See also Mecham, Agency, sec. 714; Clark & Skyles, Law of Agency, secs. 466-471; Greenleaf, Evidence, secs. 113 and 114; 2 Jones Evidence, secs. 359 and 360; Am. and Eng. Ency. of Law, 1, 690-698; Wigmore, sec. 1078; Ency. of Evidence, 1, 538-556.) The facts in this case clearly bring the "service letter" within the rule making the authorized admission of an agent competent evidence against his principal (1) The "fact of agency" was admitted; (2) the admission was as to a "matter within the scope of the agent's authority;" (3) the admission "constituted a part of the *res gestae* of a transaction in which the agent was acting for his principal, and serve to characterize that transaction."

We shall divide the questions concerning the admission of the "service letter" under the following heads: (1) Is the fact that the statements were hearsay as far as Superintendent Van Housen was concerned a valid objection? (2) Is the fact that these statements did not constitute a part of the *res gestae* of the collision between the first and second sections of train 81 a valid objection? (3) Is the fact that these statements were not made at the time Mr. Smith, the trainmaster, told Guernsey that he was discharged, a valid objection? (4) Are the statements made by Van Housen incompetent on the ground that while he had a right to discharge Guernsey and state in the service certificate that he was discharged, still he did not have a right to go further and state the facts constituting the specific reasons for Guernsey's discharge? (5) Is it a valid objection to the statements contained in the service letter that

they constitute the "opinion, conclusion, conjecture or de-
duction" of Superintendent Van Housen?

(1.) That this admission is not objectionable because the
facts contained therein are hearsay as far as Van Housen
is concerned, see Wigmore, sec. 1053; *Kitchen v. Robins,*
29 Ga. 7,13, 716; *Bishop of Meath v. Marquess of Win-
chester,* 3 Bing. N. C. N. 183, 203; *Bulley v. Bulley,* L. R.,
9 Ch. App. 739, 747, 751; *Wasey v. Insurance Co.,* 126
Mich. 119, 85 N. W. 459; *Sparr v. Wellman,* 11 Mo. 230,
234; *Reed v. McCord,* 160 N. Y. 330, 54 N. E. 737;
*Thayer's Cases,* Ev., p. 112; *Miller v. Denman,* 8 Yearg.
237; *Shaddock v. Clifton,* 22 Wis. 114 (2 & 3). We
have already discussed the *res gestae* of this transaction
and trust have established that it is entirely separate from
the *res gestae* of the collision. The fact that Mr. Smith,
the trainmaster, told Mr. Guernsey on the night of Feb-
ruary 5th that he was discharged, may lead to the conclu-
sion that the service letter was no part of the *res gestae* of
the discharge. However that may be, we think the matter
wholly immaterial as to whether the giving of the service
letter is regarded as a part of the discharge or not, it is
admitted that in itself it was an authorized act, and there-
fore has a *res gestae* of its own. *Res gestae* as heretofore
set forth simply means accompanying an authorized act,
and counsel admits that the service letter was authorized.
This we think is conclusive on the question of the *res gestae.*
(4) Counsel argues that Superintendent Van Housen had
a right to go so far in the service certificate, but had no
right to go as far as he actually went. A sufficient answer,
we submit, to this contention is that there was a strong
showing of authority for the issuing of the service letter,
and in the absence of any contradiction of that showing
appellant is bound by the record made on the trial. It was
admitted on the trial that Van Housen was the superintend-
ent of the defendant for the division covered by the acci-
dent; it was shown that it was the custom, and the strong
inference is that it was the contract right of the discharged
employee Guernsey to receive a "service letter" upon leav-

ing the defendant. (5) Counsel objects to the statements
in the service letter on the ground that they constitute the
opinion, the conclusion or conjecture of the superintendent.
We submit that this phase of the question is satisfactorily
disposed of by the authorities we have cited under the "hear-
say" objection to the service letter. It was there shown
that the fact that the admissions were based upon hearsay
is no objection.

STRAUP, C. J.

The plaintiff brought this action to recover damages for
the death of her husband, alleged to have been caused by
the defendant's negligence.

It is alleged in the complaint that the defendant negli-
gently ran and operated "a certain train known as 'section
No. 2' of train No. 81 at a high and dangerous rate of
speed into and against a certain train known as the 'first sec-
tion' of train No. 81, and in disregard of the schedule which
it had theretofore established for the running of trains,"
whereby the deceased, who was the conductor of the first
section, was killed. The defendant denied the alleged neg-
ligence, and pleaded contributory negligence and negligence
of fellow-servants. The two sections were made up at
Black Rock, Utah. W. C. Guernsey was the conductor of
the second section. The crews of both sections received or-
ders from the train dispatcher to leave Black Rock and
run to Caliente, Nevada. The first section left at about
9:55 p. m. of the 4th day of February. The second section
left about thirty or forty minutes later. No further orders
were received from the dispatcher by either crew. The
collision occurred about one and one-quarter miles east of
the east switch at or near Beryl, Utah, on February 5th,
at about 4:25 a. m., as testified to by some witnesses, or at
4:30 or between 4:28 and 4:29, as testified to by others.
The station there consisted of only a switch track and a
water tank. The distance between the east and west switch
is three thousand feet. Freight train No. 81 was scheduled
on the time card to leave Beryl at 4:30 a. m. The last

stopping place was at Lund, about twenty miles east of Beryl. The second section at Lund overtook the first section. The first section left Lund at 3:55 a. m., about twenty minutes late. The second section left about seventeen or twenty minutes thereafter. The speed of the first section running from Lund to Beryl was from fifteen to twenty miles an hour until within about two and one-half miles of the place of the accident, when it slowed down to about five or seven miles an hour, at which speed it was running when the rear end was run into by the second section with such force as to demolish the caboose and three cars ahead of it, and to derail a number of other cars. The engine of the second section, and about ten cars of that section, were also derailed, and a couple of them crushed. The second section, after it left Lund, made an average speed of from twenty-seven to twenty-eight miles an hour. When it struck the rear of the first section, it was running thirty miles an hour as testified to by the conductor of the second section, or about twenty miles an hour, as testified to by the engineer of that section. The deceased and two brakemen of the first section, who were in the caboose, were killed. The first section had not intended to stop at Beryl. The second section had intended to do so "to water an outfit."

It is further shown that at the time of the accident one of the injectors on the engine of the first section—an apparatus which automatically fed water from the tank into the boiler—gave the engineer some trouble, and had bothered him for the last eight or ten miles, and had given him more or less trouble during the trip. The engineer of that section testified that he was working on the injector at the time of the accident, and because it did not work properly the steam was shut off, which reduced the speed of the train. The morning was very dark and foggy. The first section displayed the usual tail lights on the rear of the caboose. The average speed of the train in the vicinity of the accident, as shown by the time card, would be 10.7 miles per hour, and over the entire division 13.5 miles. A number of rules

of the defendant were put in evidence, some by the plaintiff, others by the defendant. Among them were the following:

Rule 91:

"Trains in the same direction must keep at least five minutes apart, except in closing up at stations or at meeting and passing points."

Rule 92:

"A train must not arrive at a station in advance of its schedule time. A train must not leave a station in advance of its leaving time."

Rule 98a:-

"Stations having yard limits will be designated in special rule in time-table. All trains and engines will have the right to work within such yard limits regardless of all except first-class trains, but will give way as soon as possible upon their approach. All except first-class trains will approach yard limits under full control and be prepared to stop within the limits of vision. The responsibility for accident at such points will rest with the approaching train. At such stations as have no yard limit signs, the limits will be considered to be between extreme switches."

Rule 9:

"The speed of passenger trains will ordinarily be that prescribed in the schedule, but in case of delay, requiring a greater speed in order to enable trains to make meeting points or to secure connections, the speed may be so moderately increased above that prescribed in the schedule as in the judgment of the conductor and engineman in charge of the train may be safe and prudent, due consideration being always given to conditions of track and all the circumstances. Freight trains will not exceed a speed of thirty miles per hour, i. e., will consume not less than two minutes in running each and every mile."

Rule 99:

"When a train stops or is delayed under circumstances in which it may be overtaken by another train, the flagman must go back immediately with stop signals a sufficient distance to insure full protection. When required, he may return to his train, first placing two torpedoes on the rail when the conditions require it. The front of a train must be protected in the same way when necessary by the fireman."

Some witnesses testified that when a first section of a train left a station twenty minutes late, and the second section left seventeen or twenty minutes thereafter, it was the custom of railroad companies to require the conductor and crew of the first section to protect the forward train, in the nighttime and when necessary, by throwing off fusees until it got back on schedule time. Most of the witnesses who so testified also testified that the throwing off of fusees was largely within the judgment and discretion of the conductor. Other witnesses testified that it was not the custom, under such circumstances, to throw off fusees or otherwise protect the train in that manner, unless it was not making reasonable headway, or had stopped, or was about to be stopped. The engineer of the second section testified that at Lund he was flagged by a fusee, and that from the time he left Lund until the accident he "did not run on to any burning fusees, nor did my engine explode any torpedoes." He further testified that, "immediately before hitting the train, I knew that we were about a mile and a quarter, or maybe two miles, from Beryl. I was on the lookout. I saw the tail lights of first eighty-one about five car lengths ahead of me. I then set the air in emergency." The case was tried to the court and a jury. A verdict was rendered in favor of the plaintiff. The defendant appeals.

The first assignment of error relates to the ruling of the court in admitting in evidence rule 98a. The objection made to its admissibility was that it was immaterial and irrelevant. We think the rule was relevant and material as bearing on the care and conduct of the respective crews, especially that of the second section in approaching Beryl.

The conductor of the second section, a witness on behalf of the plaintiff, was asked: "When were you due at Beryl?" The question was objected to on the ground that "it is incompetent and not the best evidence; that the time-table in evidence is the best evidence." The objection was overruled, and the witness answered that "it depended on how late the first section is. The second section had to be

five minutes behind the first section; and, if the first section was on time, the second section was due at 4:35 a. m." We think no error was committed in the ruling. The fact to be proved—when was the train due at Beryl—was not the contents of a writing, but an independent fact to which the writing (the printed time-table) was merely collateral, or of which it was merely an incident. Furthermore, neither the plaintiff nor the deceased was a party to the writing, nor did the plaintiff assert any right founded upon or growing out of it, nor had either any connection with the instrument, in the sense that the writing was regarded or understood to be the sole repository of the fact. "The question was not what was the contents of this printed paper; but when should the cars have arrived at that point." (*C., B. & Q. R. R. v. George,* 19 Ill. 510, 71 Am. Dec. 239.)

The trainmaster of the defendant, a witness called in behalf of the plaintiff, was permitted to testify, over the defendant's objection, that the defendant made, and that the witness held, an investigation of the accident; that he had power to employ and discharge men; that it was his duty to make an investigation and to report findings to the superintendent; that he was subpoenaed to bring with him the report of the investigation, and that he did not produce it because it had been transmitted to the superintendent. When this evidence was offered, it was stated by plaintiff's counsel that they "desired to show an admission made by the company with regard to this accident after having full knowledge of it." Guernsey, the conductor of the second section, testified that he was discharged on the day of the accident, and that on the 14th day of February a "service letter" was issued and delivered to him by the division superintendent, and that he lost the letter. Notice was given to the defendant to produce a copy of it. In response to the request, the defendant brought into court a letter book entitled "service letters from Aug. 1903, to ———," containing copies of service letters, including the one issued

and delivered to Guernsey. Guernsey testified that, when an employee voluntarily or otherwise left the service of the railroad company, he was given a service letter which he could use or not as he pleased in seeking employment with other railroad companies. The plaintiff, after identifying the copy contained in the letter book so produced by the defendant, offered the copy in evidence. The material parts of the letter are:

"San Pedro, Los Angeles & Salt Lake Railroad Company, Salt Lake Division. Employee's Service Certificate. Salt Lake City, February 14th, 1906. This is to certify that Willard C. Guernsey has been in the service of this company as follows: Conductor . . . from second month, second day, 1905, to second month, fifth day, 1906. Cause of leaving, discharged. . . . Specify conduct and cause of leaving: Discharged while on train 2nd No. 81, February 5th, 1906; ran down train 1st No. 81, which was on time, causing rear end collision. Dismissed from the service on account of his utter disregard of the time-table, rules and instructions."

This letter was signed by "H. E. Van Housen, Superintendent." On the upper left-hand corner was stamped, "S. P., L. A. & S. L. R. R., Salt Lake Division, February 14, 1906. Office of Superintendent, Salt Lake City, Utah." It was shown that H. E. Van Housen, the person who issued and signed the letter, was the superintendent of the division in which the accident occurred. The admission of the letter in evidence was objected to on the ground that it was immaterial, incompetent, and hearsay; that it contained a mere narrative of past events, was not a part of the res gestae, and was only the conclusion of the person writing it. The objection was overruled and the copy admitted in evidence. Complaint is made of this ruling. The respondent seeks to uphold the ruling on the doctrine that the principal is bound by the authorized admission of his agent. In this respect it is contended: (1) That the relation of agency between the defendant and the writer of the letter was undisputed; (2) that the admission or statement in the letter pertained to a matter within the scope of the agent's authority; and (3) that the admission constituted a part of the res gestae of a transaction in which the

agent was acting for his principal. That Van Housen was the division superintendent, and that some sort of agency existed between him and the defendant, was clearly established. That the statement or admission, however, was made within the scope of the agent's authority is not so clear. It is not claimed that any direct or special authority was shown. The proof upon the subject is that, when an employee left the service of the railroad company, it was the custom of the company to give him a so-called service letter; that the person who signed and gave the letter in question was the superintendent of the division in which the accident occurred; that a report of an investigation by the trainmaster had been transmitted to him; and that a copy of the letter was produced by the defendant in response to a notice. There is no direct proof to show whose duty it was to write or give such a letter, nor what was the scope of the authority of the person whose duty it was to write it. From the mere fact that the letter was written and signed by the superintendent it may not be presumed that it was within the scope of his authority to write such a letter as was here written by him, or that he was otherwise authorized to make such an admission. Though it may be said that the giving of service letters to employees who were discharged from or who had left the defendant's service was within the apparent scope of the superintendent's authority, and that the letter given by him was given in the discharge of duties to be performed by him, yet we are of the opinion that the letter was improperly admitted in evidence, for the reason that the transaction with respect to which the alleged admission was made and related was itself immaterial and inadmissible. The statements contained in the service letter, of course, were not *res gestae* of any transaction connected with or related to the accident, nor of the transaction of Guernsey's discharge. Guernsey was discharged, not by the superintendent, but by the trainmaster, the day of the accident or the day after. Nine days after that time the superintendent gave Guernsey the service letter. The statements made by the superintendent in the

letter were not made by him while he was in the performance or in the discharge of any duties which related to the discharge of Guernsey, nor of any duties which related to any of the transactions of the accident or which were in any wise connected therewith; nor were they made while he was acting for the principal with respect to the matters and things recited in the letter. When the statements were made, he was not then engaged in the performance of duties, nor in the conduct of business, which related to the transactions characterized by the statements. In other words, the statements of the agent were not contemporaneous with the transactions characterized by them, but were as to such transactions mere narratives of past events. The transaction with respect to which the superintendent made the statements, and of which they were *res gestae,* was the giving of a service letter to Guernsey. That transaction was not material to any issue in the case, and was itself inadmissible in evidence. Whether Guernsey was or was not entitled to a service letter, or the character and contents of the letter to which he was entitled, were matters wholly immaterial to the issue. If the transaction with respect to which the statement or admission of the agent is a part, the transaction which the agent was conducting for the principal and in respect of which the statement or admission was made is itself immaterial and inadmissible, then the statement or admission of the agent is not in law the admission of the principal and admissible for such purpose, unless special authority for making the admission is shown. To that extent the admissibility of an admission of the principal himself, and that of his agent, stands on a different footing. The principal's own admission may, of course, be received in evidence, regardless of the question whether the transaction with respect to which it is made was itself material to the issue and admissible in evidence. But to bind the principal by a particular admission of his agent made not by special or direct authority, but within an alleged apparent scope of authority, the transaction in which the agent was acting for the

principal and in respect of which the statement or admission of the agent was made and to which it related must itself be material and admissible. This principle is readily deducible from the authorities which generally hold that "the admission or declaration must constitute a part of the *res gestae* of a transaction in which the agent was acting for his principal, and serve to characterize that transaction." (Huffcut on Agency [2 Ed.], sec. 138; Mechem on Agency, sec. 714.) And so are the authorities generally. Such has been the holding of this court. (*Moyle v. Congregational Society,* 16 Utah 69, 50 Pac. 806; *Idaho Co. v. Insurance Co.,* 8 Utah 41, 29 Pac. 826, 17 L. R. A. 586.) In the first case, while the question was correctly decided, yet the expression in the opinion that "the declaration, however, must be voluntary and spontaneous, and so proximate in point of time as to grow out of, elucidate, and explain the character and quality of the main fact, and must be so closely connected with it as virtually to constitute but one entire transaction, and to preclude the idea of design, afterthought, or a mere narrative of a past transaction," may be, in some particulars, inapt, when applied to the question there involved.

The rules of evidence permitting the immediate and spontaneous declarations and acts of persons to be received in evidence as an exception to the hearsay rule, when they are a part of the *res gestae* of a transaction itself admissible in evidence and, and permitting declarations and acts of the agent to be received in evidence as the declarations or acts of the principal himself, "involve two distinct and unrelated principles." (Wigmore, Ev., sec. 1078.) But in either case, to render the declaration or act admissible, it must be a part of the *res gestae* of a transaction itself admissible in evidence. In the one case the admission of the declarations or acts rests on the principle that they are intimately interwoven with the transaction of which they are a part, and that they are the spontaneous expression of  6

thoughts or acts created by and springing out of such transaction. The declarations in such case are admissible in evidence for or against either party, regardless of the relation of agency. In such case it is proper enough to say that the declarations "must be voluntary and spontaneous," and "so as to preclude the idea of design," etc. In the other the admission rests upon the principle of agency and the authority of the agent in the particular instance to speak for the principal. But, in the absence of some direct or special authority to make the admission, the law does not charge the principal with the declarations or admissions of the agent, unless the "declarations or statements are made during the transaction of business by the agent for the principal, and in relation to such business and while within the scope of the agency; in other words, unless the representations may be deemed a part of the *res gestae.*" And, "since the declarations of the agent are not admissible unless they constitute a part of the *res gestae,*" and "cannot be received unless they are contemporaneous with the acts which they illustrate and of which they form a part" (Jones, Ev. [2d Ed.], sec. 255), it necessarily follows that, if the transaction of which they are a part is itself material and inadmissible, the declarations themselves are likewise inadmissible. We think the court erred in the ruling. We are also of the opinion that the error was prejudicial.

The contents of the letter, the alleged admission, bore directly upon two issues: One in respect of the care or negligence of the crew of the second section, especially that of Guernsey, the conductor of that crew; the other, the care or negligence of the deceased and members of his crew. That Guernsey and his crew upon the evidence adduced independently of the admission were guilty of negligence in the running and operation of their train is not open to much, if any, controversy. The evidence showing that the second section was run in violation of rules 91 and 98a, and of the time-table, and as stated by the superintendent in the service letter, is substantially without conflict. But it is recited

in the letter that Guernsey "ran down train 1st No. 81, which was on time, causing rear-end collision." The statement that the first section "was on time" is, upon the evidence open to some controversy. It is conceded that no time was fixed for the arrival of the first section at Beryl. The time for its departure was fixed at 4:30 a. m. The collision occurred about one and one-fourth miles east of the east switch. If the collision occurred at 4:25 a. m., as testified to by the engineer of the first section, and the time when the deceased's watch stopped, it may be said that the first section was on time, as stated by the superintendent, when the collision occurred. If, however, the collision occurred at 4:30, as testified to by the engineer of the second section, then the first section was not on time, for it was then at least a mile and a quarter east of Beryl. Nor, when it is considered that the yard limit of such a station as Beryl was "between extreme switches," as stated in rule 98a, and that the accident happened one mile and a quarter east of the east switch, can it conclusively be said that the first section was within the yard limits, or had reached Beryl, when the collision occurred. It having been shown that when one train followed another and was required to "keep at least five minutes apart," by the testimony of some of the witnesses that it was the custom "of a conductor in charge of the first section of the train when behind time to protect against the rear section with fusees when necessary, or torpedoes, or otherwise," and by others that it was not the custom to do so unless the first section was "not making reasonable headway; nor standing still, nor expected to be stopped," the question whether the first section was on time was material. Since the evidence on such question was conflicting, we cannot say that the jury was not influenced by the statement of the superintendent in reaching a verdict, which, as rendered necessarily implied a finding that the deceased was not guilty of contributory negligence. If, for instance, it should have been argued to the jury that the first section was behind time and because of such fact, and of the in-

jector on the engine not working properly thereby requiring the steam to be shut off and the speed of the train reduced to five or seven miles an hour, the deceased, in view of all the circumstances, ought to have protected his train by throwing off fusees, and was negligent because he did not do so, such a position would have been somewhat inconsistent with the statements of the superintendent, which, having been received in evidence as the defendant's admission, were powerful weapons, not only to convict Guernsey of negligence, but also to exonerate the deceased of the charge of contributory negligence. To hold that the ruling was not prejudicial requires a holding that the evidence without conflict not only shows that Guernsey was negligent, but also that the deceased was not at fault. To so hold leads to the conclusion that the plaintiff was entitled to a directed verdict on the question of the defendant's liability. We are not prepared to say that the plaintiff on the undisputed evidence was entitled to recover as a matter of law.

It is further contended that the court erred in charging the jury that the deceased and the train crew of the second section, including Guernsey, were not fellow-servants. The statute defining who are, and who are not fellow-servants, is as follows:

"All persons who are engaged in the service of such employer and who, while so engaged, are in the same grade of service and are working together at the same time and place and to a common purpose, neither of such persons being intrusted by such employer with any superintendence or control over his fellow employees, are fellow-servants with each other; provided, that nothing herein contained shall be so construed as to make the employees of such employer fellow-servants with other employees engaged in other departments of service of such employer. Employees who do not come within the provisions of this section shall not be considered fellow servants."

It is made to appear that the two sections of the train were run and operated as two distinct and independent trains, and that the defendant regarded and treated them as being subject to the rules applicable to the running and

operation of separate trains. The question then arises: Are the members of train crews of separate trains fellow-servants within the meaning of the statute? We think they are not. They are not in such case "working together at the same time and place and to a common purpose." Such has been the holding of the courts of Texas, the state from which the Utah statute was borrowed. (*Patterson v. Houston & T. C. R. Co.* [Tex. Civ. App.], 40 S. W. 442; *Missouri, K. & T. Ry. Co. v. Hines* [Tex. Civ. App.], 40 S. W. 152; *Texas & N. O. R. Co. v. Echols,* 17 [Tex. Civ. App.] 677, 41 S. W. 488; *Missouri, K. & T. Ry. v. Whitlock,* 16 [Tex. Civ. App.] 176, 41 S. W. 407; *Gulf, C. & S. F. Ry. Co. v. Warner,* 89 Tex. 475, 35 S. W. 364; *Masterson v. Galveston, etc., Ry. Co.* [Tex. Civ. App.], 42 S. W. 1001; *Long v. Chicago, R. I. & T. Ry. Co.,* 94 Tex. 53, 57 S. W. 803.) In these and other cases from that court it is, in effect, held that under the statute, to be fellow-servants, the two servants must have a present corresponding relation with the labor or duty then being performed, and that they must be directly co-operating with each other in the accomplishment of an immediate end or purpose as distinguished from a remote or ulterior end or purpose. It can here be said, as was said by the court in the case of *Texas & N. O. R. Co. v. Echols, supra*:

"While the grade of employment may be said to have been the same, they were not working together at the same time and place, nor to a common purpose. The purpose contemplated by the statute is of an immediate, and not ulterior, purpose. It might as well be said that the train crew in charge of the train that carried the ties and placed them on the spur track were working to a common purpose with the crew that unloaded and stacked them for the purpose of having them treated with creosote, as that appellee's crew were fellow-servants of the dinkey-track crew; and in the same manner might it be reasoned that the men who cut the timber were working to a common purpose with the track layers. It seems that the purpose here, within the meaning of the statute, is that of unloading and stacking the ties ready for the crew that took them down and unloaded them onto the dinkey trucks. But all of the conditions of the test must be met. Were they working together at the same time and place? It is true that 'at' may indicate nearness only in point of time and place; but again the

train crew furnishes an illustration. They reach nearness in point of place when they shove the loaded car onto the spur track, and may do so in point of time when the crew to unload the car take it and commence their work. Certainly these two crews would not be fellow-servants. There is a distinct line drawn between the time of the work of the crew on the spur track and the dinkey crew and one almost as distinct as to place. The intent of the law is to relieve the master from liability only when the servants are brought into such contact with each other that they might see the danger and presently prevent it. They are thus made careful for each other only to the extent of acts presently done, and not those done by servants distant in point of time or place, of which they have had no opportunity to know."

In the case of *Gulf, C. & S. F. Ry. Co. v. Warner, supra*, the Texas court also said:

"The distinctive characteristics prescribed by the statute as essential to be found concurring and common to two or more employees in order to constitute them fellow-servants are: First. They must be 'engaged in the common service.' As here used, 'service' means the thing or work being performed for the employer at the time of the accident, and out of which it grew, and 'common' means that which pertains equally to the employees sought to be held fellow-servants, and therefore 'common service' means the particular thing or work being performed for the employer at the time of the accident, and out of which it grew, jointly, by the employees sought to be held fellow-servants. The members of a crew running a train, though each be in the performance of different acts in reference thereto, are all 'engaged in the common service,' for they are jointly performing the thing or work of managing the train for the employer; but they would not be 'engaged in the common service' with the members of a crew running another train for the employer over the same road for one crew would be jointly performing the thing or work of managing one train, while the other would be jointly performing the thing or work of managing the other train."

We think the construction placed upon the statute by the Texas court better reflects the legislative intent and the purpose sought to be accomplished by the statute than that which was placed upon a similar statute by the Missouri court in the case of *Strottman v. St. Louis, I. M. & S. Ry. Co.*, 211 Mo. 227, 109 S. W. 769, where it was held that an engineer operating a train was a fellow-servant with a telegraph

operator and station agent upon the theory that they were in the same grade of service and were working together at the same time and place and to a common purpose. We also think that the case of *Dryburg v. Min. Co.,* 18 Utah 410, 55 Pac. 367, is an authority to the effect that the servants of the two crews were here not fellow-servants. In that case the plaintiff, a laborer, was at work on a level of a mine about forty feet above a lower level where the offending servant was at work. Through the negligence of the servants on the lower level the support of one side of a ladder which was used in going from one level to another was removed. The plaintiff was injured in his attempt to descend the ladder. The trial court granted a nonsuit on the grounds that the plaintiff was guilty of contributory negligence, and that he and the servant whose negligence caused the ladder to be made insecure were fellow-servants. On appeal Chief Justice Zane, in delivering the opinion of the court, held that the question of plaintiff's negligence ought to have been submitted to the jury, and, after defining and construing various parts of the fellow-servant statute, also held that "whether the plaintiff and Saunders (the offending servant) were 'fellow-servants,' as that term should have been defined by the court in his charge, would have been a question of fact to be found by the jury from the evidence." He therefore held the ruling of the court granting a nonsuit erroneous, reversed the judgment, and remanded the case for a new trial. Mr. Justice Bartch dissented. Mr. Justice Miner in concurring said: "I concur with the Chief Justice in that part of the opinion holding that the question of contributory negligence of the plaintiff, under the testimony, should have been submitted to the jury, and that the order granting a nonsuit was erroneous. I do not concur in the rule as to the construction of the statute with reference to fellow-servants as presented in the opinion. I am of the opinion that the judgment should be reversed for the reason given, and a new trial granted."

It is said that, while it may be difficult to ascertain the point on which Chief Justice Zane and Mr. Justice Miner

agreed to reverse the judgment and remand the case, yet
it is clear that they did not agree on the construction placed
upon the statute by the Chief Justice. (*Lukic v. So. Pac.
Co.*, 160 Fed. 135.) It is manifest that they agreed in
the holding that the question of plaintiff's negligence was
one of fact. It is also clear that Mr. Justice Miner did
not agree with what was said by the Chief Justice in de-
fining and construing the statute. But it is just as evident
that he did agree with him on the conclusion reached, that,
under the statute, and upon the facts appearing in evidence,
the plaintiff and the offending servant were not fellow-ser-
vants, or, at least, that the question was one of fact for the
jury. Such a holding and conclusion were necessarily inher-
ent in his concurrence in the judgment of reversal. While
they did not agree upon the meaning to be given the pro-
visions of the statute drawn in question, and the construc-
tion to be placed upon them, yet, by the reversal of the judg-
ment of the court below, concurred in by both of them, they
necessarily agreed that, in the light of the statute, and upon
the facts made to appear, the two servants were not fellow-
servants as matter of law. To that extent the case is an
authority on the question here involved. So is the case of
*Jenkins v. Mining Co.*, 24 Utah, 513, 68 Pac. 845, where
it was held by a unanimous court that a servant whose
duty it was to manage and operate a cage by which miners
were conveyed in and out of the mine was not, under the
statute, a fellow-servant with a miner, nor was a miner a
fellow-servant with a tool carrier whose duty it was to take
sharpened tools into the mine and throw them off at various
levels and bring up the dull ones. It was there held that
the miner and the cage manager and the miner and the tool
carrier were not working together at the same time and place
and to a common purpose within the meaning of the statute.
Whatever difficulty there may be in ascertaining what was
decided in the Dryburg Case, there ought not to be any diffi-
culty in ascertaining what was decided in the Jenkins Case.
In *Neesley v. So. Pac.*, 35 Utah 259, 99 Pac. 1067, it was
recently held by us that a railroad engineer operating a train

was not a fellow-servant with a telegraph operator nor with a section foreman nor with section men. While it was there held that these servants were not in the same grade of service, yet it was also held, in effect, that they were not working together at the same time and place and to a common purpose. '

We think no error was committed in the charge complained of, nor in other rulings involving the question of fellow service.

For the reasons heretofore given, the judgment of the court below is reversed, and the case remanded for a new trial. Costs to appellant.

FRICK and McCARTY, JJ., concur.