## TYNG v. CONSTANT-LORAINE INV. CO.

No. 2655.    Decided January 3, 1916.    (154 Pac. 767.)

1. CORPORATIONS—OFFICES—RATIFICATION OF ACTS BY CORPORATION. R., in reply to a telegram from plaintiff's broker, wired an offer to accept $1,000 for a 30-day option to purchase certain property at a specified price, such $1,000 to be deposited to his credit immediately in a named bank, and such deposit was made by plaintiff. R. was president of the defendant corporation, and title to the property was in defendant, and it made and forwarded to the bank a deed to the property. *Held*, that it thereby ratified the transaction and became bound by whatever contract was made by R. (Page 339.)

2. APPEAL AND ERROR—LAW OF THE CASE—NEW TRIAL. In an action to recover back a payment on a contract for the sale of land on the ground that defendant did not have title to all of the land agreed to be conveyed, the Supreme Court held that defendant had neither authorized nor ratified an agreement by a bank with which the payment was deposited by defendant's direction, with respect to the terms of the sale, and that telegrams passing between defendant's president and plaintiff's broker evidenced the terms of the contract. *Held*, that whether right or wrong, this holding was the law of the case, and was binding on a retrial on the same evidence. (Page 339.)

3. EVIDENCE—PAROL EVIDENCE TO REMOVE AMBIGUITY. Where telegrams concerning an option for the sale of real estate described the real estate as "property west side State street,"

the description was ambiguous, and extrinsic evidence was competent to aid the ambiguity. (Page 339.)

4. VENDOR AND PURCHASER—CONSTRUCTION OF CONTRACT—EVIDENCE. Plaintiff's broker wired defendant, asking for its price on property described as "west side State" and defendant, after some intervening telegrams in which the broker was referred to K. & G. for exact information, wired the broker that it would accept $1,000 for a thirty-day option on "property west side State street," the balance to be paid within thirty days, and the $1,000 to be deposited immediately in a named bank. Defendant owned only one lot on the west side of State street, and the plat in the recorder's office showed this lot to be 55x165 feet, but the abstract books and records of deeds showed that defendant had title by warranty deed to only 53½ feet, and that it had a quit-claim deed to 1½ feet, which 1½ feet were in the adverse possession of other parties. Plaintiff deposited $1,000 with the bank, and received a receipt from it, stating that it was on account of the purchase price of property described as a lot 55x165 feet, and that the property was to be conveyed by warranty deed upon payment of the balance of the purchase price, but this agreement by the bank was neither authorized nor ratified by defendant. It did not appear that plaintiff ever examined the plat in the recorder's office, or the abstract books or records of deeds or the property itself, or that he saw K. and G. for information, but it did appear that he saw a "real estate man's plat" which showed the property to be 55x165 feet, before or after paying the $1,000. It did not appear where the bank got its information as to the size of the lot. There was other evidence justifying a finding that plaintiff understood that fifty-five feet were to be conveyed by warranty deed. *Held*, that while the bank's receipt was not evidence of the terms of the contract, it was competent evidence to show how plaintiff understood the ambiguity in the contract as to the number of feet which was to be conveyed by warranty deed, it having been seen and relied on by him. (Page 339.)

5. VENDOR AND PURCHASER—CONSTRUCTION OF CONTRACT—EVIDENCE. There was no sufficient evidence to justify a finding that defendant agreed to convey fifty-five feet by a warranty deed, or that it meant or intended to convey any other or different property than was owned by it, and the court therefore erred in submitting the question in an action to recover back the payment made, as to whether it agreed to convey fifty-five feet by warranty deed. (Page 342.)

6. VENDOR AND PURCHASER—PERFORMANCE BY VENDOR—TENDER OF DEED. If plaintiff understood and regarded the contract as an

agreement to convey whatever property defendant owned on the west side of State street, defendant performed its agreement by tendering a deed warranting title to 53½ feet, and quitclaiming as to 1½ feet, and was under no obligation to return the payment made. (Page 342.)

7. VENDOR AND PURCHASER—FAILURE OF MINDS TO MEET—RECOVERY OF PAYMENTS. If plaintiff understood the ambiguous contract as an agreement to convey fifty-five feet by warranty deed, there was no meeting of the minds, and no contract, and he was entitled to recover the amount paid. (Page 342.)

8. VENDOR AND PURCHASER—ACTIONS—EVIDENCE. The evidence was not so conclusive that plaintiff understood the contract as an agreement to convey fifty-five feet by warranty deed to entitle him to a directed verdict. (Page 342.)

9. EVIDENCE—DECLARATIONS OF AGENT—ADMISSIBILITY. In an action to recover a payment on a contract for the purchase of land on the ground that defendant did not have title to all of the land agreed to be conveyed, defendant contended that the contract was made by its president personally and not by it. Plaintiff was permitted to testify that after a former trial resulting in defendant's favor, he had an interview with defendant's president, in which he offered to discuss the case "man to man" and "settle this between ourselves," that defendant's president declined to discuss the case, saying that "the jury says it is mine, and I guess it is mine," and offered to flip a penny to see who would take the amount involved. He also testified that nothing was said as to whether his suit lay against defendant or the president. Held, that this was not admissible to contradict defendant's claim that if any one was liable it was its president and not it, or to show its reason for withholding the money, as the president by virtue of his office had no authority to make admissions against defendant as to past events. (Page 344.)

For former appeal see 37 Utah, 304, 108 Pac. 1109.

Appeal from District Court, Third District; *Hon. F. C. Loofbourow,* Judge.

Action by Charles Tyng against the Constant-Loraine Investment Company.

Judgment for plaintiff. Defendant appeals.

REVERSED and REMANDED.

*Howat, MacMillan & Nebeker* for appellant.

*Pierce, Critchlow & Barrette* for respondent.

## APPELLANT'S POINTS.

Notice of facts and circumstances sufficient to put a purchaser of land upon inquiry, is notice of all the facts that an honest and diligent inquiry would disclose. (*Simmons Coal Co.* v. *Doran*, 142 U. S. 438; *Paxton* v. *Brown*, 61 Fed. 883.) An officer, such as a president, secretary, manager, etc., has no inherent power by virtue of his office, to contract for his company. (*Kansas Co.* v. *Deval*, 72 Fed. 717; *Tobin* v. *Roaring Railroad*, 86 Fed. 1020; *Twelfth St. Market Co.* v. *Jackson*, 102 Pa. St. 269; *Stanley* v. *Sheffield L. I. & C. Co.*, 83 Ala. 260, 4 Southern, 34; *Templin* v. *C. B. & Q. R. Co.* [Iowa], 35 N. W. 634; *Griffith* v. *Railroad Co.* [Iowa], 36 N. W. 901; *Missouri & J. R. Co.* v. *Looney*, 71 Am. Dec. 491; *Blair* v. *Bear River*, 20 Cal. 602; *Millville T. Co.* v. *Goodwin*, 53 N. J. Eq. 448, 32 Atl. 263.) All persons dealing with officers of the corporation are chargeable with notice of the limitations upon their authority by the charter of general laws. (Clark & Marshall on Private Corp., p. 2171 (c); *Relfe* v. *Rundle*, 103 U. S. 226; *Louisville T. Co.* v. *Louisville Ry.*, 75 Fed. 450.) In order to make a ratification of an unauthorized act of an agent effectual, it must be made with full knowledge of all the material facts on the part of the principal and the burden is on the party affirming the ratification to prove that the principal had such knowledge and acquiesced in and adopted the agent's acts. It is not enough for him to show that the principal might have known the facts by the use of diligence. (*Murray* v. *Nelson L. Co.* [Mass.], 9 N. E. 637; *Nixon* v. *Palmer*, 8 N. Y. 401; *Smith* v. *Tracy*, 36 N. Y. 79; *Yellow Jacket Co.* v. *Stevenson*, 5 Nev. 224; *Owings* v. *Hull*, 9 Peters [U. S.] 629.) Even though Rowan was acting as the agent merely of defendant, the authority granted to him to sell does not carry with it the power to bind his principal to convey by warranty. (*Nixon* v. *Hyseratt*, 5 Johns. 58; *Heath* v. *Nutter*, 50 Me. 378; *Howe* v. *Harrington*, 18 N. J. Eq. 495.)

STRAUP, C. J.

The substance of the complaint is, that the defendant, a resident corporation of California doing a real estate business, was, subject to a $20,000 mortgage, "the record owner, as appeared from the plat books and other records in the office of the county recorder of Salt Lake County, Utah," of particularly described real property, a lot 55x165 feet, on the west side of State Street, in the City of Salt Lake; that the defendant, on the 9th of September, 1907, gave the Equity Investment Company, a Utah corporation doing a real estate business in Salt Lake City, an option to purchase the property subject to the mortgage, for $30,000, $1,000 cash, and $29,000 on or before 30 days thereafter, and that in pursuance thereof the equity investment company for the credit of the defendant, deposited with the National Bank of the Republic at Salt Lake City, $1,000, and took the bank's receipt therefor, which, so far as material, acknowledged payment of the $1,000 "on account of the purchase price" of the property described in the complaint, a lot 55x165 feet, and recited the further payment of $29,000, to be made within thirty days thereafter, when the property was to be deeded by warranty deed, free from all incumbrances, except the mortgage, and the taxes for 1907. The receipt, or writing further recited that:

"This deposit is made with the National Bank of the Republic and accepted by them under authority of the following telegram from R. A. Rowan: 'Los Angeles, California, Sept. 6-7, 1907. Thomas E. Rowan, Salt Lake, Utah: Will accept one thousand for thirty days option for property west side State street. Price fifty thousand subject to twenty thousand mortgage. Balance thirty thousand to be paid in cash on or before thirty days from date. Taxes to be pro-rated. One thousand to be deposited to my credit immediately with National Bank of Republic, they to notify me by wire. R. A. Rowan.'"

It then is alleged that the Equity Investment Company, in paying the money and taking the receipt, acted for the plaintiff and that he understood and believed that the defendant

was the owner and in possession of 55x165 feet, and that it legally could convey that much ground by warranty deed, and that the Equity Investment Company, immediately upon paying the money, made over and assigned the bank's receipt or writing to the plaintiff. It further is alleged that on the 9th of October, 1907, and within the option period, the plaintiff tendered the sum of $29,000 and demanded a warranty deed, but that the defendant tendered a warranty deed for only 53½x165 feet and a quitclaim for 1½x165 feet. This the plaintiff declined to accept and averred that the defendant was the owner and in possession of only 53½x165 feet, and that it, at no time, was the owner or in possession of the 1½x165 feet, which, as is averred, was possessed and held adversely by another, by reason of which the defendant, at no time, could grant or convey any interest therein, but of which the plaintiff had no knowledge until after the payment of the $1,000. It further is alleged that the deed tendered by the defendant "was not in conformity with the terms of said option or offer or agreement to sell" as evidenced by the bank's receipt and writing; that upon the defendant's failure to give a warranty deed for the whole of the fifty-five feet, the plaintiff demanded a return of the $1,000 theretofore paid, which was refused. Hence the plaintiff prayed judgment for $1,000 and interest.

The case was tried to a jury who rendered a verdict in plaintiff's favor in accordance with the prayer of the complaint. The defendant appeals and urges that the court erred in refusing to direct a verdict, to charge the jury as requested, in misdirecting the jury, and in permitting answers to be made to certain questions propounded to the plaintiff as a witness.

As shown by the records in the recorder's office of Salt Lake County, one Colgate, in 1903, by warranty deed, conveyed the lot, 55x165 feet, to one Halloran. In June, 1905, Halloran, by warranty deed, conveyed 53½x165 feet, and by quit-claim 1½x165 feet, to R. A. Rowan of Los Angeles. In December, 1905, Rowan, by warranty deed, conveyed 53½x165 feet, and by quitclaim 1½x165 feet to the defendant, and in July, 1908, the defendant, by R. A. Rowan, its presi-

dent, and P. D. Rowan, its secretary, by warranty, conveyed 53½x165 feet, and by quitclaim, 1½x165 feet to one Snell of Salt Lake City. The plat in the recorder's office shows the lot to be as conveyed by Colgate to Halloran, 55x165 feet. When thereafter it was conveyed by Halloran and Rowan, 53½ feet by warranty and 1½ by quitclaim, the plat continued to show the lot to be 55x165 feet, and showed the necessary substitutions of names of grantees. The recorder testified that when conveyances are made either by warranty or quitclaim, no change as to the description or dimension of the lot conveyed is made on the plat, but that the grantee's name merely would be changed. He further testified that:

"Colgate having given a warranty deed to all of the fifty-five feet, we don't question whether he owned it or not; so that the plat itself would not reveal whether the man or the corporation in whose name the property stood held title by warranty or quitclaim deed; in order to ascertain that it would be necessary to go to the deeds themselves or to the abstracts. We have an abstract book of all the transactions; a mere glance at that abstract book will show whether it is a quitclaim deed or what it is,"

—and that the record of deeds showed the character of title acquired and held by the defendant. Thus, the plat in the recorder's office indicated that the defendant was the owner of a lot 55x165 feet; but whether by warranty or quitclaim deed would not there be disclosed. The abstract book and records of deeds, however, readily disclosed the defendant's title, and the number of feet of ground 53½ feet it had by warranty and 1½ by quitclaim, the same as was conveyed to it by Rowan and by Halloran to Rowan.

Some time prior to September 4, 1907, the plaintiff informed the Equity Investment Company that he was desirous of purchasing property on the west side of State street, between Second and Third South, and in the block where the property in question is located. In pursuance of that, one T. E. Rowan, a real estate agent at Salt Yake City, but not related to the Rowans at Los Angeles, nor in any manner connected with

the defendant, on September 4, 1907, wired R. W. Rowan at Los Angeles: .

"Advise cash price west side State, taxes prorated, whether leased."

R. W. Rowan, the next day replied:

"Will accept fifty thousand. Property now mortgaged for twenty thousand at five per cent. Leases very short. See Kelsey and Gillespie for exact information. Several people now figuring on this property. Doubtless will be sold, as figure named is ten thousand less than its present value."

The same day, T. E. Rowan wired R. A. Rowan:

"Responsible party offers one thousand for thirty days' option, recommend."

R. A. Rowan, the next day replied:

"Will accept one thousand for thirty days' option for property west side State street, price fifty thousand, subject to twenty thousand mortgage. Balance thirty thousand to be paid in cash on or before thirty days from date. Taxes to be prorated. One thousand to be deposited to my credit immediately with the National Bank of the Republic; they to notify me by wire."

Upon payment of $1,000 to the Equity Company by the plaintiff, that company, on the 9th of September, deposited the $1,000 with the National Bank of the Republic to the credit of R. A. Rowan, whereupon the bank gave the Equity Company the receipt and writing heretofore referred to, and in which it is stated that the lot, described as 55x165 feet, was to be conveyed by warranty to the Equity Company on the further payment of $29,000 within thirty days thereafter. Up to this point the name of the defendant nowhere appeared in any of the telegrams, writings, or negotiations. The receipt itself is signed alone by the bank, and on its face purports to be signed on authority of the telegram from R. A. to T. E. Rowan. It, however, is shown that R. A. Rowan then was the president of the defendant and that it did some business in Salt Lake City, buying, selling, and renting real estate, had a bank account with the National Bank of the Republic in the name of R. A. Rowan, and that at the time of the negotiations, and for nearly two years prior thereto, it, and not

Rowan, was the owner of the property, and through R. A. Rowan as its president, and another as its secretary, about a year thereafter, conveyed the property to Snell. It further is made to appear that R. A. Rowan, on the 20th of September, 1907, sent to the National Bank of the Republic a·deed from the defendant, conveying the lot to the Equity Company, 53½ feet by warranty and 1½ feet by quitclaim, to be delivered on payment of $29,000 on or before the 9th of October, 1907. The plaintiff, on the 9th, tendered $29,000 to the bank who, in return, tendered the deed forwarded to it. The plaintiff declined to accept that and demanded a warranty deed to fifty-five feet. The bank was unable to make a tender of such a deed, whereupon the plaintiff demanded repayment of the $1,000. Here we thus have the propositions concerning which the parties disagree. By the defendant it is contended that whatever agreement was entered into was made between the plaintiff and R. A. Rowan and not between the plaintiff and the defendant, and that in all events the defendant had tendered a deed to the whole of the property owned by it and to all of the ground it, or Rowan, by the terms of the option, had agreed to convey. By the plaintiff it is contended that the contracting parties were himself and the defendant, and that by the terms of the option the defendant had agreed to give a warranty deed to 55x165 feet, and hence in fulfillment of the contract was required to convey by warranty that much ground.

The case was here on a former appeal. 37 Utah, 304, 108 Pac. 1109. On that trial the plaintiff was let to the jury and permitted to recover on the theory that the receipt or writing given by the bank to the Equity Company, wherein it was recited that 55x165 feet were to be conveyed by warranty, evidenced the terms of the option, and that the bank was authorized by the defendant to give such a writing, or, that it, with full knowledge that such a writing had been given by the bank, had ratified it. On that appeal we held that there was no evidence to justify findings that the defendant had authorized the making of such a contract, or that it had ratified it, and hence that the case was submitted to the jury on a theory unsupported by evidence. We thus

reversed the judgment and remanded the case for a new trial. Our views as to that are given in our former opinion. On the retrial, while the receipt or writing given by the bank was put in evidence, the court, nevertheless, charged the jury that there was no evidence to show that the defendant had either authorized or ratified the writing, and that hence the recital in the receipt, to convey 55x165 feet by warranty deed, was not binding on the defendant. Thus on the retrial the case was withheld from the jury on such theory. It was submitted on the theory of whether the defendant, independently of that writing, had agreed to convey by warranty fifty-five feet, or only the ground and title tendered by it, fifty-three and one-half by warranty and one and one-half by quitclaim. The court also charged that to find for the plaintiff the jury were required to find that he "in good faith, made the payment to the defendant of $1,000 as an acceptance of the offer contained in the telegrams, and that the defendant company wrongfully failed to perform its part of the contract resulting from said transactions."

A point is made that there is no evidence to show that R. A. Rowan, in sending the telegrams, or in anything that he did, acted for the defendant, or that the $1,000 **1, 2, 3, 4** which was paid to the bank was deposited to the credit of the defendant, or for its benefit, or that it received the money, it, in such respect, being contended that Rowan acted for himself, and that the money was deposited to his credit and for his benefit. While everything was done in the name of R. A. Rowan, except the making of the deed which was in the defendant's name, still there is sufficient evidence to justify findings that Rowan acted for the defendant, and that it received the money deposited in the bank. At any rate, the defendant, by making and forwarding the deed to the bank, ratified the transaction to convey whatever west side State street property was owned by it, upon payments being made as specified in the telegrams. The serious question is: What contract in such respect was made. As has been seen, we, on the former trial, held that neither Rowan nor the defendant authorized the bank to make a contract to convey 55x165 feet by warranty, or to make any agreement with respect to

the terms of the option, or that either ratified the writing which the bank gave in such particular. We also held that the telegrams which passed between Thomas E. Rowan and R. A. Rowan evidenced the terms of the option. Whether right or wrong, our holding as to that is the law in the case and was binding on a retrial on the same evidence. The evidence as to the bank's authority to give the writing, or as to the defendant's ratification thereof, is the same on this as on the other trial. And so was it regarded by the trial court, and for that reason were all questions as to such authority and ratification withheld from the jury. The writing which the bank gave can therefore not be looked to for the terms of the option. For that we must look elsewhere, primarily to the telegrams. In them we have the offer, acceptance, and terms of the option. Everything therein expressed is sufficiently definite and certain except the description of the property. The description stated in the telegrams is, "property west side State street." That, of course, is ambiguous. It was competent to aid the ambiguity by extrinsic evidence, which the parties were permitted to do. The further question is: Was the ambiguity sufficiently aided to ascertain the intention of the parties as expressed by them in the contract? It is clearly enough shown just where the lot is, and that the defendant owned but one lot on the west side of State street. By extrinsic evidence it also is made to appear that the plat in the recorder's office showed the lot to be 55x165 feet. It, however, is just as clearly made to appear by the abstract books and records of deeds that the title which the defendant had by warranty deed was only to fifty-three and one-half feet and one and one-half feet by quitclaim. It also is made to appear that on the one and one-half feet stood a wall of an old two-story house adversely possessed and held by another. To aid the ambiguity, "property west side State street," we do not think the plat in the recorder's office was alone conclusive as to what was intended by the parties. That, of course, was some evidence of their intention, and some evidence as to what they meant by the language, "property west side State street." But the abstract book and the records of deeds also were evidence for the same purpose. It is not shown

that the plaintiff, before he paid the $1,000, saw the plat in the recorder's office, or the abstract books or records of deeds, or even examined the property to ascertain its frontage, or that he saw Kelsey and Gillespie for information as was stated in one of the telegrams he could do for "exact information." He did see a "regular real estate man's plat" which showed the property to be 55x165 feet, just as indicated by the plat in the recorder's office. But it is not made to appear that he even saw that before he paid the $1,000. So far as disclosed by the record it is not made to appear just what information as to the exact number of feet in the lot the plaintiff had prior to, or at the time of, the payment of the $1,000, except as recited in the writing given by the bank that the lot was 55x165 feet, and that a warranty deed was to be given for that much ground. Nor is it made to appear from what source the bank got information as to the number of feet of ground to be conveyed or what induced it to give a receipt calling for fifty-five feet. Certain it is the telegram pointed to by it in its receipt as authority to accept the money, gave it no such authority, and, indeed, gave it no authority to make or specify any of the terms of the option to purchase. And we think the bank, by the recital of the telegram in haec verba, disclosed just what authority it had, that of a mere depositary. After the payment of the $1,000, and when the abstract of title was examined by plaintiff's counsel, it was discovered that the defendant had title by warranty to only fifty-three and one-half feet and a quitclaim to one and one-half feet. Then it was that he and his counsel visited the premises and found the wall of the house on the one and one-half feet. There, however, is evidence to justify a finding that the plaintiff believed and understood that the defendant was to convey fifty-five feet by warranty deed. That is supported by the bank's receipt which, while not competent, because unauthorized, to show the terms of the option, nevertheless, as it was seen and relied on by the plaintiff when the $1,000 was paid, was competent with other matters to show how he regarded the ambiguity and understood the contract as to the number of feet which, by its terms, was to be conveyed by warranty. But since it is not made to appear that the de-

fendant or Rowan, its president, had, prior to plaintiff's re-
fusal of the defendant's tender, knowledge of the terms of
the bank's receipt calling for a conveyance of fifty-five feet
by warranty, the receipt was not evidence to show either the
terms of the contract or in what sense the defendant under-
stood them with respect to the ambiguity. We also think
there is other evidence to justify a finding that the plaintiff
by the ambiguity, believed and understood that fifty-five
feet of ground was to be conveyed by warranty. On the
other hand, there is evidence to show that, had he, before
he paid the $1,000, inspected the records to ascertain what
"property west side State street," the defendant had, the
exact number of feet which it owned and was capable of con-
veying by warranty could have been ascertained, and thus
he could have known just what the defendant meant by the
phrase, "property west side State street." Thus, when the
extrinsic evidence is looked to, the meaning of the ambiguity,
"property west side State street," is about as doubtful as it
was before.

Upon the record we deduce these propositions: Since the
writing given by the bank was neither authorized nor ratified,
there is no sufficient evidence to justify a finding that the
defendant had agreed to convey fifty-five feet by war-
ranty, or that it, by the ambiguous phrase, meant, **5, 6, 7, 8**
or intended, to convey and other or different property
than was owned and tendered by it. Hence the court erred
in submitting the case to the jury on the theory that the
defendant had agreed to convey fifty-five feet by warranty and
in binding the jury as was done, that to render a verdict
for the plaintiff the jury was required to find that the defend-
ant had agreed to convey fifty-five feet by warranty. As to
the plaintiff's understanding of the ambiguity, and in what
sense he regarded the contract, there are two views: One is,
that he understood and regarded it in the sense that the de-
fendant understood it and as tendering by its conveyance,
whatever property was owned by it on the west side of State
street. If so, then the minds of the parties met; then did the
defendant tender a deed in accordance with the agreement;
and then was there no breach and no obligation to return the

·$1,000.   The other view is, that the plaintiff understood the ambiguity to mean a conveyance by warranty of fifty-feet. If so, then the minds of the parties did not meet; then was there no contract; and then was the plaintiff entitled to a return of the $1,000 paid by him, not on the theory of any breach of contract, but of money had and received. And for that reason was the defendant not entitled to a direction of a verdict.   On such view—the view that the minds of the parties had not met as to what was agreed to be sold and conveyed, and, therefore, if the jury so found the facts, the plaintiff was entitled to a return of the $1,000—the plaintiff asked to go to the jury; and, as appears by his requests, that was the only view on which he asked a submission of the case.   The court refused the requests or to submit the case on such theory; but, as has been seen, submitted it on the theory alone of whether the parties, independently of the recitals in the bank's receipt, and especially as evidenced by the telegrams, had entered into an agreement to convey fifty-five feet by warranty, or only fifty-three and one-half feet by warranty and one and one-half feet by quitclaim.   Notwithstanding there are no cross-assignments, and no request or motion in the court below on behalf of the plaintiff to direct a verdict in his favor, he, nevertheless, in defense of the verdict and judgment, urges an affirmance, on the theory embodied in his refused requests.   Since this is a law case in which our power to review—except jurisdictional matters—is restricted to assignments of error, and where we may not, as in equity, look into the evidence to determine the correctness of the judgment, and as there was no motion nor request to direct a verdict in plaintiff's favor, nor even any assignment presenting the rulings refusing his request, our power to affirm the judgment on the theory of money had and received is doubtful, even though on a review of the evidence it should appear that such a direction, had it been asked, would have been justified.   But looking into the record as we have, we, as already indicated, are of the opinion that the evidence is not so conclusive as to have entitled the plaintiff to such a direction had such a request been asked or motion made.   So too, apparently, was the case regarded by the plaintiff himself, and

hence asked for no such direction as matter of law, but for a submission as matter of fact. Thus is it apparent that to now affirm the judgment on the theory urged would be to infringe upon the right to trial by jury and to uphold the judgment upon a wholly different theory from that on which the case was submitted. The judgment, therefore, must be reversed, and the case again remanded for a new trial.

There is another point presented. The plaintiff, over the defendant's objection, was permitted to testify to a conversation he had in California with R. A. Rowan nearly a year after the commencement of the action, and after a trial of the cause resulting in a verdict in the defendant's favor. The plaintiff, in such respect, testified that in November, 1908, while visiting in California, he entered Rowan's office, and, on being presented to him, Rowan said: "You are the fellow who is suing me," and after inviting him to his room asked what he could do for him. The plaintiff replied: "I just happened to be passing, and looked up here and saw your windows, and seeing that I had a lawsuit with you I thought I would come up and discuss it man to man. I thought possibly I could show you I was right or wrong, and we might settle this between ourselves." Rowan, after calling for the correspondence in his office, and looking over it, said: "Tyng, I don't know as I want to discuss this thing with you. The jury says it is mine, and I guess it is mine. Come on, let's go out and see the town." As they were leaving, Rowan said: "Tyng, I will flip a penny with you to see who takes the $1,000." Tyng said: "Rowan, I am a pretty good gambler, but I never yet flipped a penny for a thousand dollars." Rowan thereupon said: "That $1,000 is mine. If you had called the bluff, I probably would have backed down." Plaintiff testified that thereupon they left, and that he was shown the town by Rowan, and that "we were two pretty good friends; that is all there was about it." Then the plaintiff was asked what, if anything, in that conversation, was said as to whether "your lawsuit lay against" the defendant or Rowan, and over further objections was permitted to answer that "nothing was said."

This testimony was permitted on the theory, putting it

in the language of plaintiff's counsel, that "any observations of the president of this company upon the matters in issue between the plaintiff and the defendant are competent testimony whether it be admissions against interest or what it may be," and of an implied admission to dispute the defendant's claim, that if any one was liable to the plaintiff, the liability was Rowan's and not the defendant's. It is quite clear no authority was shown on behalf of Rowan to then make admissions against the defendant as to past events. No such authority can be implied from the fact that he was an agent or officer of the defendant. 3 Clark and Marshall, Private Corporations, Section 727; *Meyers* v. *Railroad,* 36 Utah, 307, 104 Pac. 736, 21 Ann. Cas. 1229; *Idaho* v. *Insurance Company,* 8 Utah, 41, 29 Pac. 826, 17 L. R. A. 586. Here it also is urged that the evidence was material as bearing on "the question of a demand of the money and as showing the reason why the same was withheld by the defendant." That but involves the same principle, binding the principal by the admission of an assumed agent, not made in the course of a transaction or in the course of any business then being conducted for and on behalf of the principal, but wholly as to past events, without even a showing that any agency at all then existed between the defendant and Rowan. It further is argued that the testimony was harmless. Because it so slightly tended to prove what was claimed for it, it does not appear to be very harmful. Still, the testimony, in some slight degree, affords a basis of just such arguments as are made concerning it to show the defendant's "observations on the matters in issue," and showing "a demand of the money and the reason why it was withheld by the defendant." To that extent it may have done harm; at least it is hard to say it did no harm. It involved not only matters of incompetency but also of irrelevancy; an apparent fairness on the part of the plaintiff to adjust his controversy out of court "man to man," and the defendant's willingness to hazard its claim or defense on a "flip of a penny." The testimony probably was not so harmful as to alone require a reversal of the judgment.

But for the reasons heretofore given, together with this, the

346        SUPREME COURT OF UTAH.        [June

Mountain Lake Min. Co. v. Midway Irr. Co. et al., 47 Utah 346.

judgment is reversed and the case remanded for a new trial. Costs to appellant.

FRICK and McCARTY, JJ., concur.